**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ALZENIA WALLS and SUMNER COUNTY EDUCATION ASSOCIATION,** | ) ) ) | |
| **Plaintiffs,** | ) ) | **No. 3:11-cv-00848** **Judge Nixon** |
| **v.** | ) ) | **Magistrate Judge Bryant** |
| **SUMNER COUNTY BOARD OF EDUCATION,** | ) ) ) | **JURY DEMAND** |
| **Defendant.** | ) | |

<u>**ORDER**</u>

Pending before the Court is Plaintiffs Alzenia Walls's ("Dr. Walls") and Sumner County

Education Association's ("SCEA") Motion for Preliminary Injunction (Doc. No. 8) ("Motion"),

filed along with a Memorandum in Support (Doc. No. 9) and two supporting affidavits (Doc.

Nos. 10 & 11).  Defendant Sumner County Board of Education filed a Response in Opposition

(Doc. No. 18), along with a supporting affidavit (Doc. No. 18-1) and other exhibits (Doc. No.

18-2).  The Court held a hearing on Plaintiffs' Motion on December 1, 2011.  Thereafter,

Plaintiffs filed a Reply, responding to several arguments that Defendant raised for the first time

at the hearing.  (Doc. No. 24.)  For the reasons set forth below, Plaintiff's Motion is **GRANTED**

**in part** and **DENIED in part**.

I. BACKGROUND[1]

    A. *Factual Background*

---

[1] The facts in this section are drawn from Plaintiffs' First Amended Complaint (Doc. No. 7), unless otherwise noted.

SCEA is a voluntary association of professional employees of the Sumner County School System ("School System").  Over the years, Plaintiffs allege that SCEA and Defendant were parties to a number of collective bargaining agreements negotiated and ratified pursuant to Tennessee's Education Professional Negotiations Act (EPNA).  The most recent agreement covered a period through June 30, 2009; however, pursuant to EPNA, the terms of the agreement remained in effect as SCEA and Defendant negotiated the terms of a successor agreement.  Plaintiffs allege that on October 14, 2010, Defendant "challenged" SCEA's recognized status under EPNA.  Subsequently, on January 18, 2011, Defendant allegedly announced that it would cease negotiating a new agreement with SCEA.  Plaintiffs allege that Defendant then began to implement unilateral changes in the terms and conditions of the School System's employees, including an increase in payroll deductions taken for health insurance and ceasing to take payroll deductions for SCEA dues.

On February 1, 2011, SCEA filed suit in Sumner County Chancery Court and sought a preliminary injunction against Defendant.  In that action, SCEA alleged that Defendant failed to negotiate in good faith and failed to substantiate SCEA's alleged lack of majority status on October 14, 2010, as Defendant was required to do pursuant to EPNA.  On March 22, 2011, the Sumner County Chancery Court granted SCEA a preliminary injunction that would require Defendant to recommence good faith negotiations and cease implementing unilateral changes to the terms and conditions of the School System's employees.

On June 1, 2011, the Governor signed into law the Professional Educators Collaborative Conferencing Act of 2011 (PECCA), which repealed EPNA and replaced its provisions with a new statutory scheme.  In particular, PECCA eliminated collective bargaining.  (Doc. No. 9 at 2.)  Defendant then filed a motion to dismiss in Sumner County Chancery Court, which that court

granted on July 8, 2011 with respect to SCEA's claims for injunctive relief on the grounds that those claims were rendered moot by PECCA.  SCEA's claims for monetary relief remained in place, however, and that case is still pending.  (*Id.*)

On or about July 14, 2011, Dr. Walls, a teacher with the School System and current President of SCEA, allegedly called Dr. Del R. Phillips III ("Director Phillips"), the current Director of Schools for the School System.  Dr. Walls requested that SCEA be allowed to participate in the New Teacher In-Service, which it had done in prior years, by providing information to new teachers about SCEA.  Dr. Walls then allegedly sent a letter to Director Phillips on July 19, 2011, reiterating her request.  That same day, at one of Defendant's meetings, Plaintiffs allege that Dr. Walls approached Director Phillips in person to ask about her request.  Director Phillips allegedly conferred with an attorney for Defendant and told Dr. Walls that SCEA would not be permitted to participate in the New Teacher In-Service.  Also present during this exchange between Dr. Walls and Director Phillips was Art Patterson, a UniServ Coordinator with the Tennessee Education Association ("TEA") who worked with SCEA, which is an affiliate association of TEA.  Mr. Patterson allegedly sent Director Phillips a letter on July 21, 2011, urging him to reconsider his decision to prohibit SCEA's participation in the New Teacher In-Service.  Defendant asserts that its decision to bar SCEA from the New Teacher In-Service was due to the fact that it "was then, and remains, uncertain whether it would have been appropriate or lawful for it to provide one professional employees['] organization the exclusive opportunity to access [the event] in the absence of any policy or procedure allowing other professional employees['] organization the opportunity to do the same."  (Doc. No. 18 at 2.)

On July 26, 2011, Director Phillips allegedly sent a letter to all School System teachers stating that the Sumner County Chancery Court had determined that PECCA was constitutional

and replaced EPNA in its entirety. Director Phillips then allegedly declared that SCEA had no right to do any of the following, among other things: use the school or its facilities for meetings, posting of notices, or delivering mail among teachers; grant leave time due to holding SCEA office or attending SCEA or TEA functions; participate in the "Committee on Education Concerns"; represent teachers who were facing disciplinary action; participate in orientation or in-service programs for new teachers; and solicit membership formally or informally during any type of staff development meetings. Three days later, Director Phillips allegedly sent a substantially similar letter to Mr. Patterson. According to Defendant, it prohibited SCEA from engaging in the above-listed activities because it "no longer had the privileges outlined in the letter due to the lapse of [Defendant's] contract with . . . the SCEA," a fact that was inadvertently omitted from that letter and corrected in a subsequent letter sent on August 31, 2011.[2] (Doc. No. 18 at 1.)

In accordance with a state provision requiring that complaints of unlawful acts first be submitted to the local board of education, Tenn. Code Ann. § 49-5-606, Dr. Walls and seven other employees who composed the SCEA Executive Board allegedly mailed a Complaint of Unlawful Acts to Director Phillips and each member of Defendant on August 1, 2011. Two days later, on August 3, 2011, Defendant's attorney Arthur McClellan allegedly wrote a letter to SCEA's attorney, describing Dr. Walls and Mr. Patterson's communications with Director Phillips as "harassment," threatening litigation against individual SCEA members, TEA, and individual TEA members if they continued to communicate with Defendant or its representatives, other than direct communications between counsel for the two sides. Mr.

---

[2] Defendant's Response gives July 31, 2011 as the date the follow-up letter was sent. However, the Court has been unable to locate a letter with that date in the record, and believes instead that Defendant intended to refer to a letter dated August 31, 2011. In this letter—which, as explained subsequently, was a response to SCEA's Complaint of Unlawful Acts—Mr. McClellan included the clarifying language Defendant references in its Response. (Doc. No. 7-11 at 3.)

McClellan allegedly sent a letter to Mr. Patterson on the same date, demanding that neither Mr. Patterson nor TEA contact Defendant, its administration, or its staff. Again, Mr. McClellan allegedly insisted that all communications be directed through TEA's attorney.

The next day, SCEA's attorney allegedly wrote Mr. McClellan, seeking clarification of Defendant's position as articulated in Mr. McClellan's letter dated August 3, 2011. On August 5, 2011, Mr. McClellan sent a reply, allegedly stating that "[d]uring the pendency of this action all communications of any form of any subject must be made through our respective offices." McClellan allegedly also stated that SCEA lacked legal standing under PECCA to take any action because the collective bargaining agreement between the two parties had expired. According to Defendant, the letters do not reflect a flat ban on all communications; rather, they limited the ban to communications about state court litigation, which was clear given that the letters all contained headings referring to the pending state court case. (*Id.* at 2.)

On August 31, 2011, Defendant allegedly answered the August 1 complaint letter filed by Dr. Walls and her seven colleagues in the form of a letter sent by Mr. McClellan. In the month between the filing of the complaint letter and Defendant's answer to the letter, the school year began. Plaintiffs allege that this period is critical for SCEA, as it is the time where SCEA and its members make efforts to secure new members and retain existing ones. Plaintiffs allege that Defendant did not communicate with SCEA about the substance of its complaint until the formal response on August 31, and consequently, SCEA and its members were bound by the limits imposed by Defendant in its letters dated July 26, 2011, August 3, 2011, and August 5, 2011 during the commencement of the school year.

SCEA subsequently sought permission to use facilities at Station Camp High School, part of the School System, to hold a meeting. (Doc. No. 9 at 5.) On September 15, Defendant's

attorney responded with a letter stating that, in order for SCEA to use those facilities without charge, SCEA would have to include "professional development and/or higher education opportunities for its attendees" in the programming and SCEA would have to submit evidence that such topics would be included in advance of any meeting.  (*Id.* at 6.)  Defendant, again, disputes Plaintiffs' characterization of this event.  Defendant acknowledges that, in the past, SCEA was allowed to use school facilities without having to submit an application for use due to "the delicate nature of the situation and the ongoing litigation between the parties."  (Doc. No. 18 at 3.)  However, Defendant argues that it is in no way violating SCEA's rights at the current time because SCEA has "refuse[d] to make [an] approved application for free use of its facilities."  (*Id.* at 4.)

### B.  Procedural Background

Plaintiffs filed this action on September 7, 2011.  (Doc. No. 1.)  Plaintiffs thereafter filed a First Amended Complaint (Doc. No. 7), which asserts claims pursuant to 42 U.S.C. § 1983 for violations of their First Amendment rights of freedom of association, freedom of speech, and freedom of petition, and their rights under the Fourteenth Amendment's Equal Protection Clause.  (*Id.*)  Plaintiffs also bring two state law claims under PECCA.  (*Id.*)

Plaintiffs filed their Motion for Preliminary Injunction (Doc. No. 8), along with a supporting Memorandum (Doc. No. 9) and two supporting affidavits (Doc. Nos. 10 & 11), on October 7, 2011.  Defendant filed a Response on November 15, 2011.  (Doc. No. 18.)  The Court held a hearing on Plaintiffs' Motion on December 1, 2011.  That same day, the parties filed transcripts of several depositions that had been taken on November 30, 2011 (Doc. Nos. 19-1, 19-2, & 20-1) as well as the parties' pleadings in their state court case (Doc. Nos. 21-1, 21-2, 22-1, & 22-2).

Plaintiffs subsequently filed a Reply that exclusively responds to an argument Defendant raised for the first time at the hearing—that SCEA did not properly authorize the filing of this lawsuit, which Defendant pleaded as an affirmative defense in its Answer. (Doc. No. 24.) Plaintiffs assert that, because Defendant did not raise this issue in its Response, the matter was not properly before the Court (*id.* at 2), and further provide substantive analysis as to why Defendant's argument should be rejected (*id.* at 2-8). The Court agrees that the issue of whether the suit was authorized by the correct body within SCEA is not properly before the Court. Accordingly, the Court reserves judgment on this issue until a time when this argument has been argued in a motion for summary judgment or otherwise been properly raised by Defendant.

## II. LEGAL STANDARD

In determining whether to grant a preliminary injunction, the Court must consider four factors:

> "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction."

*Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011) (quoting *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)). These considerations are "'factors to be balanced, not prerequisites that must be met.'" *Certified Restoration Dry Cleaning Network*, 511 F.3d at 542 (quoting *Jones v. City of Monroe, Mich.*, 341 F.3d 474, 476 (6th Cir. 2003)). While the district court need not make specific findings about each factor "'if fewer factors are dispositive of the issue,'" *id.* (quoting *Jones v. City of Monroe*, 341 F.3d at 476), "'it is generally useful for the district court to analyze all four of the

preliminary injunction factors,'" *id.* (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 n.3 (6th Cir. 2000)). Moreover, the Sixth Circuit has stated that "'[w]hen a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor.'" *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009) (alteration in original) (quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)).

"A preliminary injunction is an extraordinary remedy which should only be granted if the movant carries his or her burden of persuasion." *Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848, 851 (S.D. Ohio 2000) (citing *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978)). Moreover, "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion," given the nature of the remedy and the exercise of power required from the court. *Leary*, 228 F.3d at 739 (citations omitted).

## III. ANALYSIS

Plaintiffs seek an injunction prohibiting Defendant, its management, and agents from engaging in ten activities:

> (1) limiting or restricting the right of SCEA members to communicate with the Board or management personnel on the same terms and under the same circumstances that other employees or professional employees' organizations are permitted to do so;
> (2) requiring that all communications from the SCEA or its officials or members, at any time and on any subject, be conveyed through counsel rather than in the ordinary course of business as permitted by other professional employees or professional employees' organizations;
> (3) barring all use of school buildings, facilities and equipment for SCEA meetings or functions;

(4) barring the posting of notices of SCEA activities or events on teacher bulletin boards;

(5) barring the use of the school system's inter-school mail or bulletin boards for any SCEA purpose;

(6) barring the transacting of "any SCEA business" on school property "at any time";

(7) barring SCEA participation in new teacher orientation and/or in-service programs; and barring solicitation of membership during any form of staff development;

(8) barring SCEA representation of professional employees who request such representation in disciplinary proceedings;

(9) prohibiting the Plaintiffs from having access at reasonable times before and after the instructional day to areas in which professional employees work; and

(10) imposing content restrictions or mandates upon the SCEA as a condition of its charge-free use of school facilities for the conduct of SCEA meetings.

(Doc. No. 8 at 1-2.)

Plaintiffs argue that all of these activities are protected by the First Amendment, the Fourteenth Amendment's Equal Protection Clause, and by PECCA. (Doc. No. 9 at 2.) They assert that the federal rights at issue are the First Amendment rights to freedom of association, freedom of speech, and freedom to petition for redress of grievances; and the Equal Protection right to use school facilities "on the same terms as other non-profit organizations without the imposition of compelled speech requirements as a condition of such use." (*Id.* at 6.) Plaintiffs similarly assert that the PECCA rights involved are the right to be free from interference or restraint in joining SCEA and engaging in concerted activities; the right to access areas where employees work "at reasonable times before or after the instructional day"; the right to use school bulletin boards, mailboxes, or other methods of communication; the right to use facilities pursuant to local board policy or procedures for community use for meetings to discuss rights guaranteed by PECCA; the right to be free from discrimination in terms and conditions of employment in a way designed to discourage SCEA membership; and the right to go onto school

property to contact employees in a manner and time that avoids interference with regular school operations.  (*Id.* at 6-7.)

A.  *Plaintiffs' Likelihood of Success on the Merits*

Plaintiffs point to four actions taken by Defendant with respect to their arguments about the likelihood of their success on the merits: (1) Defendant's blanket ban on communications between it and SCEA and its representatives; (2) Defendant's prohibition on SCEA and its representatives communicating with new teachers; (3) Defendant's requirements for facility use as explained in its September 15, 2011 letter; and (4) Defendant's violations of PECCA. The first three actions relate to First and Fourteenth Amendment rights, while the fourth relates specifically to substantive state law provisions.  Accordingly, the Court will discuss the two groups of issues separately.

1.  Plaintiffs' First and Fourteenth Amendment Claims

Three bodies of law under the First Amendment are at issue in this case: freedom of speech, freedom from retaliation for exercising First Amendment rights, and freedom of association.  With respect to restrictions on freedom of speech, the analytical starting point is to determine whether such restrictions are content-based or content-neutral.  Content-based restrictions are subject to strict scrutiny and are presumed invalid.  *Carey v. Wolnitzek*, 614 F.3d 189, 199 (6th Cir. 2010) (citations omitted).  To withstand strict scrutiny, such restrictions "must be narrowly tailored to promote a compelling [g]overnment interest," and if a less restrictive alternative is available to promote the government's interest, that alternative must be used.  *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813 (2000) (citations omitted).  The government bears the burden of showing that "the alternative will be ineffective to achieve its goals."  *Id.* at 816.  On the other hand, content-neutral restrictions on speech, such as a time,

place, or manner restrictions are subject to intermediate scrutiny. Content-neutral restrictions must be narrowly tailored to a substantial government interest and must not burden substantially more speech than is necessary to further that interest. *Richland Bookmart, Inc. v. Knox Cnty., Tenn.*, 555 F.3d 512, 522 (6th Cir. 2009). Finally, time, place, and manner restrictions must "contain adequate standards to guide [an] official's decision and render it subject to effective judicial review." *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 323 (2002) (citing *Niemotko v. Maryland*, 340 U.S. 268, 271 (1951)).

The free speech analysis also depends on the forum where such regulation of speech is taking place. The Sixth Circuit has determined a public school to constitute a non-public forum, *M.A.L. v. Kinsland*, 543 F.3d 841, 847 (6th Cir. 2008), where restrictions on speech must be viewpoint neutral and "'reasonable in light of the purpose served by the forum,'" *United States v. Kokinda*, 497 U.S. 720, 730 (1990) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 806 (1985)). Moreover, restrictions must "'not [be] an effort to suppress expression merely because public officials oppose the speaker's view.'" *Id.* (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)).

Second, public employers are prohibited from retaliating against their employees on the basis of First Amendment protected activities. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006) (citing *Connick v. Myers*, 461 U.S. 138, 142 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)). The Sixth Circuit employs a two-part inquiry when analyzing such retaliation claims: first, the court must determine "'whether the employee's speech may be fairly characterized as constituting speech on a matter of public concern.'" *Id.* (quoting *Rose v. Stephens*, 291 F.3d 917, 920 (6th Cir. 2002)). "Matters of public concern include speech that relates to any matter of political, social, or other concern to the community."

*Id.* at 256 (citing *Rankin v. McPherson*, 483 U.S. 378, 383 (1987); *Connick*, 461 U.S. at 146). This is "'determined by the content, form, and context of a given statement, as revealed by the whole record.'" *Farhat v. Jopke*, 370 F.3d 580, 589 (6th Cir. 2004) (quoting *Connick*, 461 U.S. at 147-48). The entire speech need not address a matter of public concern; it is sufficient that some portion of the speech does so. *Id.* (citing *Connick*, 461 U.S. at 149). If the speech in question does relate to a matter of public concern, the balancing test articulated by the Supreme Court in *Pickering v. Board of Education* applies. *Scarbrough*, 470 F.3d at 255. Pursuant to *Pickering*, courts must determine whether the employee's "interest in engaging in such speech outweighs the [employer's] interest 'in promoting the efficiency of the public services it performs through its employees.'" *Id.* at 257 (quoting *Pickering*, 391 U.S. at 568).

Finally, the Supreme Court "has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, [and] petition for the redress of grievances." *Roberts v. Untied States Jaycees*, 468 U.S. 609, 618 (1984). The "'right of expressive association,' *i.e.*, the 'right to associate for the purpose of speaking[,]' . . . protects against laws that make 'group membership less attractive' without 'directly interfer[ing] with an organization's composition.'" *Miller v. City of Cincinnati*, 622 F.3d 524, 537 (6th Cir. 2010) (second alteration in original) (quoting *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*, 547 U.S. 47, 68, 69 (2006)). There is a three-step process for such expressive association claims: first, a court must determine "whether a group is entitled to protection"; second, a court must determine whether the government action "'significantly burden[s]' the group's expression," giving deference to the group's "'view of what would impair its expression'"; and third, a court must balance "the government's interest in any restriction . . . against the plaintiff's

right of expressive association." *Id.* (alteration in original) (citing and quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 655, 653, 656 (2000)).

Moreover, under the Equal Protection Clause of the Fourteenth Amendment, classifications that affect fundamental rights are subject to strict scrutiny. *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397, 410 (6th Cir. 1999). The right to freedom of speech under the First Amendment is just such a fundamental right. *Barden Detroit Casino, L.L.C. v. City of Detroit*, 230 F.3d 848, 855 (6th Cir. 2000) (citing *Band of Lake Superior Chippewa Indians*, 172 F.3d at 410). "Under strict scrutiny, a regulation infringing upon a fundamental right will only be upheld if it is narrowly tailored to serve a compelling state interest." *Dubay v. Wells*, 506 F.3d 422, 429 (6th Cir. 2007) (citing *Reno v. Flores*, 507 U.S. 292, 305 (1993)).

a. Defendant's Prohibition on Contact

Plaintiffs first argue that Defendant's blanket prohibition on contact between it and SCEA or its representatives, under the threat of litigation, violates Plaintiffs' First Amendment rights of free speech, free association, and petition. (Doc. No. 9 at 10.) Plaintiffs assert that, because the prohibition is "unlimited in scope," it therefore affects speech on matters of public concern. (*Id.* at 11.) Plaintiffs then argue that the existence of prior and ongoing litigation between SCEA and Defendant in state court does not serve as a compelling government interest that would justify such an infringement of Plaintiffs' First Amendment rights because Defendant's prohibition is a "ban on all speech about any subject." (*Id.*) Hypothetically, however, Plaintiffs argue that if Defendant's purpose had been to "avoid inadvertent communications" regarding the state suit, and assuming that such a purpose would satisfy the compelling government interest requirement, then the ban would nevertheless fail the First

Amendment test because such a ban is in fact the most restrictive, rather than the least restrictive, means of achieving that purpose. (*Id.* at 11-12.)

Plaintiffs also explain that this flat ban imposed on SCEA may give rise to an Equal Protection challenge. (*Id.* at 12 n.7.) Plaintiffs note that, while they believe that this ban has only been imposed on SCEA and its members, they cannot be assured of that suspicion until discovery has been conducted. (*Id.*) If they are correct, Plaintiffs argue that they will have a claim concerning "differential treatment with respect to a fundamental right, i.e. speech," which will be subject to strict scrutiny. (*Id.*) With respect to this Equal Protection analysis, Plaintiffs reassert that the existence of ongoing litigation would similarly fail to be a compelling governmental interest, and thus Plaintiffs would be likely to succeed on the merits on this potential Equal Protection claim. (*Id.*)

Defendant's Response asserts that there is no flat ban on communication. Instead, Defendant argues that the ban on communications implemented through its correspondence simply covered communications relating to the ongoing state court litigation. (Doc. No. 18 at 7.) With respect to the specific language in the August 3, 2011 letter, Defendant claims that this "harsh language" should be viewed "in the context of a series of repeated requests and refusals to communicate through counsel regarding the decision surrounding the New Teacher [In-Service]." (*Id.*) Moreover, Defendant points to the fact that all such letters sent to Plaintiffs contained a "'Re:' statement clearly identifying the prior litigation as the subject matter of the letters." (*Id.* at 8.) Consequently, without providing any substantive First Amendment analysis, Defendant argues that Plaintiffs have a low likelihood of success on the merits with respect to this claim. (*Id.*)

As an initial matter, the Court finds that Defendant has mischaracterized the ban on communications. While Defendant is correct that the letter contains a "Re:" line referring to the state court case (Doc. No. 7-10 at 1), and Defendant's desire that "the parties communicate through counsel on matters related to the [state court] litigation" (Doc. No. 18 at 7) may be a common sense strategy for attorneys, Defendant's position that the ban was limited to communications about the state court case is simply unsupported by the letter itself.   Mr. McClellan's August 5, 2011 letter to Plaintiffs' counsel clearly reads: "During the pendency of this action all communications of any form on any subject, must be made through our respective offices." (Doc. No. 7-10 at 1.)  The Court fails to understand how such a plain statement can constitute anything but a flat ban on communications between SCEA and Defendant.

Moreover, the Court is not persuaded by Defendant's position that such a prophylactic ban "did not occur" (Doc. No. 18 at 7), an argument that Defendant reasserted at the hearing, noting that Dr. Walls allegedly gave a speech at a recent Board meeting about teacher evaluations.  As such, Defendant argues that a preliminary injunction is not necessary.  Again, it is clear from Mr. McClellan's August 5, 2011 letter that the ban, as written, covers all communications on any subject, and thus this argument will not affect the Court's analysis.

Lastly, the Court takes note of an argument that counsel for Plaintiffs made at the hearing.  In contesting Defendant's characterization of the ban, Plaintiffs argued that, if Defendant is truthful in stating that it intended to only ban communications regarding the state court lawsuit, then an injunction barring Defendant from carrying out a total ban on communications would not harm Defendant.  The Court agrees with this assessment.  By limiting Defendant to a ban only on communications related to the litigation, the Court would, in effect, be reinforcing what Defendant says it has already done.

Accordingly, in light of the plain language of the August 5, 2011 letter, the Court will treat Defendant's ban on communications as a total ban on communications for the purposes of the First Amendment analysis, to which the Court now turns.

"Deciding whether a particular regulation is content based or content neutral is not always a simple task." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994). Generally speaking, "laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based." *Id.* at 643 (citations omitted). On the other hand, "laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content-neutral." *Id.* (citations omitted). For example, in *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, the Supreme Court held that an ordinance that prohibited the posting of signs on public property was content-neutral, stating that "the ordinance is neutral – indeed it is silent – concerning any speaker's point of view." 466 U.S. 789, 804 (1984).

With this in mind, the Court finds that Defendant's ban on communications should be treated as a content-neutral restriction on Plaintiffs' speech. Of course, the ban is not a time, place, or manner restriction—those that are most often considered content-neutral restrictions— but the ban is plainly not content-based, as all communications on any topic are subject to the ban. The fact that the ban is limited to a certain group of people such as SCEA does not change this analysis, as the ban quite obviously does not target a particular type of content, and can include a range of topics on which Plaintiffs may want to communicate with Defendant. In light of the content-neutrality of the ban, therefore, the ban must be narrowly tailored to a substantial government interest and must not burden substantially more speech than is necessary to further that interest. *Richland Bookmart, Inc.*, 555 F.3d at 522.

The only governmental interest to which Defendant has even tangentially referred would be to prohibit Plaintiffs from communicating with Defendant about the SCEA and Defendant's state court litigation and the implementation of PECCA. (Doc. No. 18 at 7.) Even if Defendant's interest in avoiding inadvertent communications relating to pending litigation would be determined to be "substantial," an all-out ban on communications quite clearly burdens substantially more speech than is necessary to further this interest. Defendant could have limited communications to the topics of the ongoing state court litigation, which, Plaintiffs argued at the hearing, are simply claims for damages due to Defendant's increase in insurance premiums teachers were required to pay and Defendant's refusal to deduct SCEA dues from teachers' paychecks, thus resulting in SCEA's loss of dues.[3] Instead, Defendant imposed an all-out ban on communications.

At this juncture, the Court notes that Plaintiffs have also asserted that the communications ban interferes with their right to free association, but have provided no substantive analysis of that issue (Doc. No. 9 at 10-12), other than generally outlining the legal standard for such claims (*id.* 9-10). Defendant similarly fails to provide argument as to this claim. (*See* Doc. No. 18 at 7-8.) Because the Court finds that Plaintiffs are likely to succeed on one of their substantive arguments about Defendant's flat ban, the Court finds it unnecessary to develop the merits of a potential claim for infringement of Plaintiffs' right to freely associate under the First Amendment. Furthermore, Plaintiffs have made an Equal Protection argument

---

[3] At the hearing, Defendant contended that the constitutionality of PECCA is still undecided by the state court and thus is also a topic of the litigation. Plaintiffs disputed this characterization, arguing that the state court already determined PECCA to be constitutional, and thus Defendant's argument is based only on the possibility that the result may change on appeal. However, Defendant has provided a copy of the state court ruling, which clearly shows a finding that PECCA was constitutional. (Doc. No. 18-2 at 7.) Moreover, other documents in the record show that Defendant previously admitted that the state court so ruled as to PECCA's constitutionality. (*Id.* at 10; Doc. No. 7-4.) Given that the state court has issued a final ruling as to the constitutionality of PECCA, and that Defendant has admitted as much on the record, the Court agrees with Plaintiffs that only two damage claims remain pending in state court.

with respect to this issue, pending future discovery.  At this point, given that Plaintiffs have not

been able to provide concrete evidence that other specific groups have been treated differently

than SCEA, the Court will not entertain such arguments.  Should Plaintiffs uncover such

evidence during this litigation, the Court will revisit this claim at a more appropriate time.

In light of the foregoing analysis, therefore, the Court finds that Plaintiffs have

demonstrated a strong likelihood of success on the merits with respect to their First Amendment

free speech claim on Defendant's flat ban on communications.  The Court now turns to

Plaintiffs' other substantive claims.

b.  Prohibition on Plaintiffs' Contact with Teachers

Plaintiffs also argue that they are likely to succeed on the merits with respect to

Defendant's prohibition on SCEA's participation in the New Teacher In-Service.  (Doc. No. 9 at

12.)  Plaintiffs assert that SCEA only desired to speak with new teachers during breaks and at an

SCEA-provided breakfast, set up materials in the hall outside the event, and set up a "store"

where teachers could purchase school supplies, none of which would have interfered with the

event.  (*Id.*)  Plaintiffs argue that the July 26, 2011 letter Defendant sent to all teachers, and its

August 31, 2011 response to Plaintiffs' Complaint of Unlawful Acts, highlight the "content-

based nature of [the] restriction on . . . Plaintiffs' speech and on the unfettered discretion

exercised by [Defendant] in regulating Plaintiffs' speech."  (*Id.* at 12-13.)  In particular, Plaintiffs

point out that Mr. McClellan stated that only certain types of content would be allowed in SCEA

use of school bulletin boards: "professional development opportunities, higher educational

opportunities, and/or individual school employee or school celebration/information."  (*Id.* at 13.)

Plaintiffs contend that Defendant continued this content-based restriction on September 15,

2011, when Mr. McClellan imposed certain requirements on SCEA in order to use school facilities free of charge. (*Id.* at 13-14.)

Plaintiffs also point to Defendant's statement in the August 31, 2011 letter that SCEA would be prohibited from sending "blast emails or using teachers' school system email addresses" as well as sending emails during the school day. (*Id.* at 14.) By contrast, Plaintiffs argue, Defendant has allowed the "Tennessee Religions Freedom Fund" to send emails to teachers during the school day on school system email addresses. (*Id.*) According to Plaintiffs, this organization was formed as a response to a lawsuit filed by the ACLU against Defendant to raise money for "defending against federal lawsuits from the ACLU and similar anti-liberty and anti-religion organizations." (*Id.*)

Plaintiffs assert that Defendant's restrictions on speech, whether in the form of restricting content or compelling certain content, fails to withstand strict scrutiny under the First Amendment. (*Id.* at 15.) Plaintiffs argue that Defendant lacks a compelling interest in requiring SCEA to include certain content in its programs as a condition to using school facilities at no cost and in limiting the content of SCEA's use of school bulletin boards. (*Id.*) Plaintiffs argue that no such bulletin board restrictions are contained in PECCA or in Defendant's official policies, and thus the policy was imposed solely on SCEA. (*Id.*)

Finally, Plaintiffs argue that the "best analysis for" Defendant would be that the restrictions constitute time, place, and manner restrictions on speech. (*Id.*) Plaintiffs assert, however, that this framework is inapplicable to Defendant's ban on SCEA's communications because "the restrictions are indeed content-based" in that "SCEA has been singled out for these restrictions." (*Id.* at 16.) Had Defendant truly had a substantial governmental interest in these restrictions, as it is required to have under the intermediate scrutiny analysis for time, place, and

manner restrictions on speech, Defendant would have had the ban extend to all organizations, not simply SCEA.  (*Id.*)

In response, Defendant argues that the prohibitions cited by Plaintiffs are reasonable restrictions.  Defendant states that it prohibited SCEA from participating in the New Teacher In-Service as part of a general plan "to have no professional employee[s'] organization" participate in the event.  (Doc. No. 18 at 8.)  Defendant asserts that it decided to do so because it had yet to "formulate[] a policy allowing for equal access by an interested professional employees['] organization" in the wake of the passage of PECCA, and it wanted to avoid any liability that may have followed from allowing SCEA to have exclusive access to the event.  (*Id.*)  Defendant also asserts that injunctive relief would be inappropriate with respect to the New Teacher In-Service claim because the event is over, and thus Defendant will have sufficient time to formulate a policy as to organizations' participation in next year's event.  (*Id.* at 10.)

With respect to communications, Defendant again responds that its restrictions are reasonable.  Defendant asserts that "no organizations are guaranteed use of the school's internal mail systems during the instructional day," as they "are reserved by the schools and [Defendant] for matters related to school business during the instructional day."  (*Id.* at 11.)  While SCEA had been allowed use of the mail systems in the past, Defendant argues that such use was pursuant to the collective bargaining agreement previously in place.  (*Id.*)  Following the lapse of that agreement, Defendant argues that SCEA is now subject to the same treatment as everyone else: they are "allowed by policy to use the physical mailboxes prior to and after the instructional day for unrestricted dissemination of information."  (*Id.*)  In terms of Defendant's email system, Defendant argues that it "has an across-the-board policy forbidding any outside organization or individual from using its internal email system to send 'blast' emails to all teachers in the

system." (*Id.* at 13.) Defendant asserts that the email sent by the "Tennessee Religions Freedom Fund" was an unsolicited email that was not approved by Defendant, and thus it cannot serve as a basis for Plaintiffs' constitutional claims. (*Id.* at 13-14.) Finally, as to the bulletin boards, Defendant again states that it has a blanket policy allowing professional employee[s'] organizations to access the boards before and after the school day. (*Id.* at 15.) While SCEA "enjoyed the use of a dedicated bulletin board" as part of its contract prior to the implementation of PECCA, Defendant argues that "nothing has changed" under the new policy except that SCEA no longer has access to a bulletin board of its own. (*Id.*)

At the hearing, counsel for Plaintiffs disputed Defendant's characterization that the change in treatment of SCEA was simply due to the expiration of the parties' collective bargaining agreement. Rather, counsel asserted that the July 26, 2011 letter clearly referred to activities that were not rights under the collective bargaining agreement, such as SCEA's ability to participate in the New Teacher In-Service event.

Having examined a copy of the collective bargaining agreement that Plaintiffs have filed with the Court, it is clear that both Plaintiffs and Defendant are correct in certain respects as to whether the restrictions were tied to specific contract rights. In their Motion, Plaintiffs object to nine of the sixteen restrictions imposed in the July 26, 2011 letter as a result of the state court ruling that PECCA was constitutional. (Doc. No. 9 at 3-4.) These restrictions, as written in the original letter, read as follows:

> Because of the ruling, the Sumner County Board of Education has no obligation to perform; and the Sumner County Education Association (SCEA) has no right to any of the following:
> [1] - use of school buildings, facilities and equipment for SCEA meetings or functions;
> [2] - the posting of notices of activities and/or events on teacher bulletin boards;

[3] - use of the school system's regular inter-school mail delivery system (email) and/or teachers' bulletin boards for any purpose;
[4] - transacting any SCEA business on school property at any time;
. . . .
[5] - granting of specific leave time due to holding SCEA office or attending SCEA/TEA (Tennessee Education Association) functions;
[6] - participation in the "Committee on Education Concerns;"
[7] - representation of teachers reprimanded, warned, or disciplined;
. . . .
[8] - participation in new teacher orientation and/or teacher in-service programs; [and]
[9] - solicitation of membership formally or informally during any form of staff development[.]

(Doc. No. 7-4 at 1.)

Defendant's assertion that the rights now restricted by this letter were originally contract rights is correct for the first seven of the nine restrictions to which Plaintiffs object. The Court has found references to SCEA's right to use facilities (Doc. No. 21-2 at 19 ¶ A), post notices on school bulletin boards (*id.* at 19 ¶ B(1)), use Defendant's email system (*id.* at 19 ¶ B(2)), transact SCEA business on school property (*id.* at 19 ¶ C), use leave time for SCEA/TEA functions (*id.* at 42 ¶ 6; *id.* at 44 ¶ 7), sit on the "Committee on Education Concerns" (*id.* at 50 ¶ B), and represent teachers (*id.* at 51 ¶ B) among the provisions of the collective bargaining agreement. However, the Court has been unable to locate any references to SCEA's right to participate in new teacher orientation programs or to solicit membership during staff development events. Plaintiffs' assertion at oral argument that those rights do not, in fact, come from the collective bargaining agreement appears, therefore, to be correct.

Nevertheless, the Court finds that Plaintiffs are unable to demonstrate a strong likelihood of success on the merits on their First Amendment claims relating to these restrictions. Put plainly, the record is not sufficiently developed to determine which party is likely to—or even

has the possibility of—success on the merits. For example, there is almost no evidence in the record regarding SCEA's past participation in the New Teacher In-Service event. The only relevant documents that Plaintiffs have submitted are a copy of Dr. Walls's letter to Dr. Phillips that formalizes her request to participate in the 2011 event (Doc. No. 7-2) and Mr. Patterson's letter urging Dr. Phillips to reconsider his denial of Dr. Walls's request (Doc. No. 7-3), both of which refer to the fact that SCEA has participated in the New Teacher In-Service in the past. The Court otherwise lacks any information as to SCEA's previous participation in the New Teacher In-Service, a trend that is at the foundation of Plaintiffs' argument as to this claim, given the fact that the participation was not one of SCEA's now-extinguished contract rights.

Additionally, Defendant has rested much of its arguments on the alleged across-the-board policy for use of communications systems, but the only written policies that Defendant has submitted into the record refer—minimally—to employees' use of bulletin boards and mailboxes. (Doc. No. 18-1 at 13-14.) Because it appears that this written policy, which is in the form of an undated[4] letter to the School System's principals (*id.* at 12), was merely meant to reflect "some changes [that] [were] being made to how information will be distributed among [the principals'] employees" (*id.*), the Court assumes that Defendant refers to other pre-existing policies that are not in the record. Moreover, there appears to be a factual dispute as to whether the e-mail from the "Tennessee Religions Freedom Fund,"[5] to which Plaintiffs refer in their argument on this claim, was sanctioned by Defendant.

In light of the dearth of this type of evidence, therefore, the Court is unable to make any judgments as to Plaintiffs' arguments about Defendant's supposed content-based restrictions, or

---

[4] Dr. Michelle Ungurait, a Chief Administrative Officer for Defendant, has testified that Director Phillips prepared this letter on August 8, 2011, and that the letter was immediately distributed. (Doc. No. 18-1 at 2 ¶ 6.)

[5] The email and a flyer attached to the email are included as exhibits to the affidavit of Sharon Walker. (Doc. Nos. 11-1 & 11-2.)

Defendant's arguments as to the reasonableness of the restrictions it has put in place. Such a lack of clarity in the facts counsels for a finding that Plaintiffs have failed to establish that they have a strong likelihood of success on the merits of this claim. *See Key Safety Sys. v. Invista, S.A.R.L., L.L.C.*, No. 08-CV-10558, 2008 U.S. Dist. LEXIS 70117, at *29 (E.D. Mich. Sept. 16, 2008) (finding that the plaintiff had not "demonstrated a strong probability of success on the merits" in light of the "disputed facts" as to the type of contract that existed between the parties).

### c. Defendant's Requirements for Facility Use

Plaintiffs also argue that Defendant's requirement that SCEA include professional development or higher education opportunities as part of its program as a condition of using school facilities for free violates Plaintiffs' First and Fourteenth Amendment rights. (Doc. No. 9 at 16.) Plaintiffs assert that Defendant maintains a policy allowing non-profit organizations to use Defendant's facilities so long as "proceeds generated are used for approved school, civic, non-profit or charitable purposes." (*Id.*) Plaintiffs argue that Defendant has unlawfully conditioned the use of school facilities, a recognized governmental benefit, on "foregoing [their] freedom of speech or accepting government compulsion of speech." (*Id.* at 17.) Characterizing this condition as "equivalent [to] a regulatory fine for the SCEA's refusal to speak on [Defendant's] preferred subject," Plaintiffs argue that the condition "is a naked interference with free speech and expressive association." (*Id.*) Plaintiffs also contend that this condition violates their Equal Protection rights because other groups seeking to use facilities at no cost would not be, pursuant to Defendant's policy, subject to the same condition on speech. (*Id.*) Plaintiffs assert that this difference in treatment would fail the strict scrutiny or compelling interest test. (*Id.*) Finally, Plaintiffs argue that Defendant's conditions on facility use restrict their "expressive activities," since they "impair[] SCEA communications not only with new teachers as

prospective members but also with existing teachers and existing members." (*Id.* at 18.)
Accordingly, Plaintiffs argue that Defendant lacks any legitimate governmental interest in the
restrictions and that Defendant's sole interests in implementing such conditions are to "muzzle
the SCEA" because it disagrees with SCEA's message and to retaliate against SCEA for filing a
state lawsuit, a protected activity under the First Amendment's right to petition. (*Id.*)

Defendant argues that not allowing SCEA to use its facilities free of charge is not a
content-based restriction, but rather is a result of an application of its reasonable requirement that
organizations seeking to use facilities free of charge qualify as a professional employees'
organization under PECCA. (Doc. No. 18 at 16.) Defendant asserts that the requirement that
any unincorporated association of teachers include educational components in its programming
is viewpoint-neutral and that it "does not seek to dictate the content of meetings held at its
expense, or any percentage of time which must be spent engaging in the qualifying activities of
educational and professional development." (*Id.* at 16-17.) Finally, Defendant contends that
granting Plaintiffs an injunction allowing them to use facilities at no cost would require
Defendant "to extend similar privileges to a host of unincorporated associations not otherwise
granted fee-free school facilities usage." (*Id.* at 17.)

As with Plaintiffs' claim related to the alleged prohibition on contact with teachers that
has been imposed on them, the Court finds that Plaintiffs have not established a strong likelihood
of success on the merits with this claim due to the lack of factual certainty in the record. Both
parties have provided a copy of what they allege to be Defendant's policy on facility use that was
in place at the time that SCEA's application was rejected. Plaintiffs provide a copy of a policy
that was last revised on November 8, 2010, and which states that "Governmental, civic and
approved non-profit organizations will not be charged [for facility use] as long as any proceeds

generated are used for approved school, civic, non-profit or charitable purposes." (Doc. No. 7-12 at 3 ¶ F(4).) Defendant provides a different document that Dr. Michelle Ungurait has testified was the policy in place on September 15, 2011. (Doc. No. 18-1 at 3 ¶ 8.) This document, by contrast, states that "All organizations (non-profit, or governmental) that are not a part of the Sumner County School system shall be responsible for ancillary costs incurred by the school system as a result of this use, e.g. costs for custodial and supervision *unless these fees have been waived by the Director*." (*Id.* at 15 ¶ 7.) This document, however, is undated and does not provide any guidelines or indication of when such fees could or would be waived. (*See id.* at 15-16.)

Dr. Ungurait has further testified that SCEA did not comply with Defendant's alleged policy, but she nevertheless "authorized" Mr. McClellan to send a letter to SCEA "permitting" SCEA to use Defendant's facilities. (*Id.* at 3 ¶ 9.) This letter, dated September 15, 2011, stated that Defendant approved SCEA's application for facility use, and would allow SCEA to use the facility at no cost "conditioned upon the use including professional development and/or higher education opportunities for its attendees," evidence of which had to be submitted in advance of the meeting. (*Id.* at 17.[6]) The letter does not provide any basis for imposing such a requirement; it does not cite to any board policy, or otherwise provide any explanation for requiring discussion of "professional development and/or higher educational opportunities for [] attendees" as a part of the meeting. (*See id.*) Thus, it is possible that such a requirement was imposed as retaliatory condition on Plaintiffs' speech, as Plaintiffs argue, but it is also possible that such a requirement was reasonably imposed due to additional policy guidelines that are not part of the record and of which the Court is unaware.

---

[6] This letter is also attached by Plaintiffs as an exhibit to their Amended Complaint. (Doc. No. 7-13.)

In light of this factual uncertainty, therefore, the Court finds that Plaintiffs have not established that they have a strong likelihood of success on the merits on their facility use claim. *See Key Safety Sys.*, 2008 U.S. Dist. LEXIS 70117, at *29 (finding that the plaintiff had not "demonstrated a strong probability of success on the merits" in light of the "disputed facts" as to the type of contract that existed between the parties).

2.      Defendant's Alleged PECCA Violations

Finally, Plaintiffs argue that they are substantially likely to prevail on their claims under PECCA. According to Plaintiffs, PECCA makes it unlawful for Defendant or its management to "interfere with, restrain, or coerce employees" in exercising their rights to self-organization through SCEA, to join or be assisted by SCEA, and to engage in other concerted activities for mutual aid and benefit. (Doc. No. 9 at 18.) Plaintiffs argue that PECCA also makes it unlawful for Defendant or its management to refuse to allow SCEA access to areas where employees work at reasonable times before or after the school day; to refuse to give SCEA access to bulletin boards, mailboxes, or other methods of communication; and to refuse to give SCEA access to facilities as permitted by Defendant's policy for community use at reasonable times. (*Id.* at 18-19.) Plaintiffs argue that Defendant's July 26 and September 15, 2011 letters are evidence that Defendant "has acted in flagrant disregard of these rights." (*Id.* at 19.)

Plaintiffs note that Defendant has sought to justify its restrictions on Plaintiffs' rights under PECCA by arguing that SCEA is not a local education agency ("LEA") "with any legal standing" under PECCA. (*Id.*) Plaintiffs respond to this justification in two ways. First, they argue that Defendant has misinterpreted the meaning of an LEA, in that the term is meant to encompass Defendant as a Board of Education, and not a professional employees' organization such as SCEA. (*Id.*) Moreover, Plaintiffs argue that the requirement that fifteen percent of

employees select a given organization under the PECCA is only applicable to "collaborative conferencing," a right that is independent of Plaintiffs' First and Fourteenth Amendment rights and that is not at issue in this case. (*Id.* at 18-19.) Thus, Plaintiffs argue that Defendant's LEA argument is unavailing.

In its Response, Defendant simply argues that the Court should abstain from deciding Plaintiffs' state law claims because no Tennessee court has interpreted PECCA. (Doc. No. 18 at 18.) Defendant also denies violating PECCA. (*Id.*) At the hearing, Defendant asserted that several lawsuits based on PECCA are pending in state courts, but decisions have yet to be issued in those cases. Plaintiffs have not disputed that assertion, and the Court has been unable to locate any cases decided under PECCA.

"Abstention is a judicially created doctrine that" first emerged in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1940), and was subsequently expanded in *Harrison v. N.A.A.C.P.*, 360 U.S. 167 (1962). *Gay v. Bd. of Registration Comm'rs*, 466 F.2d 879, 883 (6th Cir. 1972). The Sixth Circuit has articulated "several policy considerations" at the foundation of the abstention doctrine. *Id.* First, courts should seek to avoid "a premature constitutional decision by a possible narrowing construction of the state law by a state court." *Id.* (citing *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498 (1972); *Harman v. Forssenius*, 380 U.S. 528 (1965); *Zwickler v. Koota*, 389 U.S. 241, 255 (1967) (Harlan, J., concurring)). Second, courts should avoid "needless conflict in the federal-state relationship." *Id.* (citing *Younger v. Harris*, 401 U.S. 37 (1971); *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943)). Third is "the desirability of avoiding the necessity of a federal court making tentative decisions on issues of state law." *Id.* (citing *Reetz v. Bozanich*, 397 U.S 82 (1970); *Meredith v. Winter Haven*, 320 U.S. 228 (1943)).

Finally, courts should avoid "unnecessary interference with state functions or regulatory schemes." *Id.* (citing *Lake Carriers' Ass'n*, 406 U.S. 498; *Younger*, 401 U.S. 37).

Abstention is improper in certain circumstances, however. For example, "abstention is improper if the underlying issue of state law is not controlling in the present litigation, or if the federal right is not 'entangled in a skein' of state regulation." *Id.* at 883-84 (quoting *McNeese v. Bd. of Educ.*, 373 U.S. 668 (1962)). Furthermore, the Supreme Court held "abstention improper because a single state litigation could not cure the constitutional infirmities of a state loyalty oath challenged on the grounds of vagueness" in *Baggett v. Bullitt*, 377 U.S. 360 (1963). *Gay*, 466 at 884. Abstention would also be "improper if its application would require piecemeal adjudication, causing unnecessary delay in the resolution of constitutional questions." *Id.* (citing *England v. La. State Bd. of Med. Exam'rs*, 375 U.S. 411 (1963)). Additionally, "abstention applies only where the issue of state law is uncertain and relates to questions which only a state court could authoritatively construe." *Id.* (citing *Wisconsin v. Constantineau*, 400 U.S. 433 (1970); *Lake Carriers' Ass'n*, 406 U.S. 498). Finally, a court should not abstain "merely to await an attempt to vindicate the claim of the appellant in state court," *id.* (citing *Zwickler*, 389 U.S. 241), and "[t]he availability of declaratory relief in state courts is wholly irrelevant," *id.* (citing *Lake Carriers' Ass'n*, 406 U.S. 498).

In its Response, Defendant has not provided any legal analysis in its argument as to abstention, though it does state that it "renews its request to this court that it exercise its power of abstention over the state law claims." (Doc. No. 18 at 18.) The Court assumes that Defendant refers to an affirmative defense Defendant provided in its Answer wherein Defendant states that "this is an appropriate case for the application of" the abstention doctrine, and cites to *Lake Carriers' Association v. MacMullan*. (Doc. No. 14 at 7.)

In *Lake Carriers' Association v. MacMullan*, the Supreme Court explained when a federal court confronted with a state law issue should abstain from deciding the issue in the following manner:

> "Where resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication. . . . The doctrine . . . contemplates that deference to state court adjudication only be made where the issue of state law is uncertain."

406 U.S. at 511 (quoting *Harman*, 380 U.S. at 534). The Supreme Court affirmed a three-judge district court decision to abstain from deciding a complaint filed pursuant to the Michigan Watercraft Pollution Control Act of 1970, *id.* at 500, but did so for different reasons than those given by the lower court, *id.* at 509. The Supreme Court noted that the statute had "not been construed in any Michigan court, and . . . its terms are far from clear in particulars that go to the foundation of [appellants'] grievance." *Id.* at 511. The Supreme Court went on to state that it did "not know, of course, how far Michigan courts [would] go in interpreting the requirements of the state Watercraft Pollution Control Act in light of the federal Water Quality Improvement Act and the constraints of the United States Constitution." *Id.* at 512.

Given that the interpretation of PECCA is "'an uncertain issue of state law,'" *Lake Carriers' Ass'n*, 406 U.S. at 511 (quoting *Harman*, 380 U.S. at 534), and that litigation related to the new statutory scheme is apparently ongoing in state courts, the Court believes that the most prudent course of action would be to abstain from deciding Plaintiffs' state law PECCA claims at this time. Accordingly, Plaintiffs cannot establish that they have a strong likelihood of success on the merits on these claims.

*B.  Equitable Factors*

Beyond the likelihood of success on the merits, there are "three other factors [that] influence the propriety of a preliminary injunction: 'whether the movant would suffer irreparable injury without the injunction'; 'whether issuance of the injunction would cause substantial harm to others'; and 'whether the public interest would be served by the issuance of the injunction.'" *Hunter*, 635 F.3d at 244 (quoting *Certified Restoration Dry Cleaning Network*, 511 F.3d at 542).

"Notwithstanding this balancing approach, '[w]hen a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor.'" *Jones v. Caruso*, 569 F.3d at 265 (alteration in original) (quoting *Connection Distrib. Co.*, 154 F.3d at 288).  For example, the Sixth Circuit has stated that "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Id.* at 277 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  In addition, "[w]hen a constitutional violation is likely . . . the public interest militates in favor of injunctive relief because 'it is always in the public interest to prevent the violation of party's constitutional rights.'" *Miller*, 622 F.3d at 540 (quoting *Connection Distrib. Co.*, 154 F.3d at 288).

Because the Court has found that Plaintiffs are likely to succeed on their First Amendment claim regarding Defendant's ban on communications, all three equitable factors favor Plaintiffs as to that claim.  As the Sixth Circuit stated in *Jones v. Caruso* and *Miller*, a finding of a likelihood of success on the merits virtually guarantees a favorable finding with respect to the irreparable injury and public interest factors.  The Court also finds that the factor examining the substantial harm to others favors Plaintiffs on the same claim.  More specifically, as the Court noted above, *see supra* Section III(A)(1)(a), the Court finds merit in Plaintiffs'

argument that Defendant will not be harmed by an injunction barring Defendant from imposing a flat ban on communications, and instead holding them to a ban on communications regarding the ongoing state court litigation. With an injunction that would limit Defendant to such a narrower ban—an effect that Defendant claims it intended in and that has been realized as a result of its August 5, 2011 letter to Plaintiffs' counsel—Defendant cannot otherwise claim that it will suffer substantial harm due to the issuance of an injunction.

On the other hand, the equitable factors do not favor Plaintiffs as to their other claims. While the Court reserves its judgment as to the likelihood of success on those claims, and further abstains from Plaintiffs' state law claims, the Court cannot say that the record, as currently developed, indicates that Plaintiffs will suffer an irreparable injury with respect to those claims. Furthermore, as denying Plaintiffs injunctive relief as to their other claims should have a negligible effect on others, at best, the Court finds that the factor focusing on harm to others favors Defendant on these other claims. Lastly, the public interest similarly favors a denial of injunctive relief as to those claims. There are simply too many factual uncertainties at this time with respect to Plaintiffs' other First Amendment claims to find in favor of Plaintiffs on this factor. Moreover, as to Plaintiffs' PECCA claims, the Court concludes that the public interest favors abstaining on such claims in order to allow Tennessee courts, which are certainly more well-versed in state law than this Court, to provide guidance as to how such a new statutory scheme should be interpreted.

### IV. CONCLUSION

For the abovementioned reasons, Plaintiffs' Motion is **GRANTED in part** and **DENIED in part**. It is **ORDERED** that Defendant shall refrain from carrying out a flat ban on

communications between Plaintiffs and Defendant, mandating that all communications be made between counsel for the two parties; Defendant may only require communications to be made between counsel when the subjects of such communications relate to ongoing litigation between SCEA and Defendant in state court.

It is so ORDERED.

Entered this _____29th_____ day of December, 2011.

_____
JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT